# Fannin v. Commonwealth.

(Decided February 23, 1926.)

## Appeal from Johnson Circuit Court.

Homicide—Evidence held sufficient to support conviction for voluntary manslaughter.

CAIN & THOMPSON for appellant.

FRANK E. DAUGHERTY, Attorney General, and G. D. LITSEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

Charged with the murder of Walter Damron, the appellant, Arthur Fannin, was tried, convicted of voluntary manslaughter and sentenced to two years in the reformatory. On this appeal the only grounds urged for reversal of the judgment are, that the verdict is not sustained by the evidence, and that the court erred in not giving a peremptory instruction to the jury to find the defendant not guilty.

Appellant was 19 years of age, and the deceased 18. They lived on adjoining farms, worked as section hands on the railroad in the same crew, and appear to have been very intimate with each other. On the day of the tragedy, they, together with Omer Meek, a boy about the same age, met at a local store and started home together. On the way Meek and Fannin were throwing stones at various objects, and the deceased stated that he had a pistol which would shoot further than they could throw. A discussion arose as to whether he had a pistol and Meek took him by the right arm, while Fannin reached down and felt in his pocket, removing a pistol therefrom. Meek turned loose of his arm and Fannin pointed the pistol at the ground near the feet of deceased and told him to dance. Both were laughing and deceased set his feet apart but did not dance. Then they started on, with Meek six or seven feet in advance, all of them joking about the matter. After going 15 or 20 steps Fannin and Damron stopped. Fannin still had the pistol in his hand pointed toward Damron, when it was discharged and Damron said he was shot. The boys both told him that he was not, but he unbuttoned his clothing and fell, saying: "Oh, Arthur, buddy, you have killed me." They laid him on the creek bank and Arthur threw the pistol away and told Meek to go and inform someone, that he would stay with Damron. Meek went to the nearby home of Wert Skaggs, who, with his wife, went to the place. When they arrived Fannin was supporting Damron and said: "I shot him; it beats all I ever seen." The only thing Damron said was: "Boys, you ought not to have done me that way." Robert Booth preceded the Skaggs, and when he arrived the boys were sitting down, and Fannin had Damron lying on his lap; he asked how it occurred and Damron told him that it was done acci-

dently. Damron was taken up and carried to Skaggs' home, Fannin assisting. Later Fannin went with Damron's father for a physician and returned to the Skaggs' home and spent the night waiting on him. The following morning Damron was taken to a hospital at Paintsville, Fannin assisting in carrying him to the train. It was found that Damron had a gunshot wound in the pelvic region. He remained in the hospital for about two weeks; his wounds appeared to be healing and he returned home, where he spent a week, when he was taken worse and carried back to the hospital and died two days later from an aneurism produced by the wound. Fannin visited him in the hospital and was with him several days during his stay at home, their relations being friendly.

Fannin's evidence as to what occurred at the time of the shooting practically coincides with that of Meek. He testifies that it was an old pistol, the mechanism of which was out of order, and that its discharge was purely accidental. It was lying loose in his hand, and while pointed in the direction of Damron, he thought his finger was on the guard and not on the trigger, and that he had no intention of discharging it; that he and Damron were "buddies" and the kindest of feelings existed between them: but, on the other hand, it appears that both defendant and deceased were paying attention to a young lady, Miss Sarah Ella Meek; that about three weeks before the tragedy, Miss Meek, with her eleven-year-old brother, both riding a mule, accompanied by Paris Daniels, on another mule, passed Fannin, Damron and three Ratcliffe boys on the road; Fannin came up and caught hold of the bridle of Miss Meek's mule and told her to stop, and made an engagement to call on her the following Sunday. One of the Ratcliffe boys got on the mule behind Daniels and they rode on. Damron came up and told Fannin to turn loose of the bridle and let the girl go on; Fannin responded that he would do so when he got ready. Miss Meek, her brother and Daniels testify that Fannin then struck Damron knocking him down. Damron arose and Fannin knocked him down again and this was repeated a third time. The other parties contradicted this in part. Fannin says he was talking low, making an appointment when Damron interfered; that he merely shoved him aside, not wanting him to hear the conversation. The Ratcliffe boys corroborate his state-

ment, except they admit that he shoved Damron *down;* they also testify that Daniels had passed out of sight before this occurred, and Miss Meek admits that she made an entirely different statement of what occurred to defendant's counsel. It further appears that after this episode, and about a week before the tragedy, Damron accompanied Miss Meek to a neighborhood party. Fannin denies knowledge of this or of the fact that Damron was paying attention to her.

All phases of the case were covered by the instructions, as to the form of which there is no criticism. Considering the question of defendant's right to a directed verdict and as to the sufficiency of the evidence, it will be observed that there is evidence tending to show an accidental shooting and to negative an intentional homicide, though there is a suggestion of a strained relation existing between the parties.

The episode in which defendant procured the pistol was apparently friendly, but his conduct in pointing the weapon toward the feet of deceased, telling him to dance and continuing to point it toward him as they walked along the road, when taken in connection with his conduct in the previous encounter, and the other circumstances of the case indicate a domineering disposition on his part, and while he exonerates himself the jury did not have to accept his version of the matter. They may have believed from the evidence that the accused was not actuated by ill will or malice, and that he did not intend to shoot deceased, and yet may have believed from the evidence that he was a bully; that he was attempting to overawe and intimidate the deceased, and in furtherance of that purpose unlawfully and with reckless disregard of the consequences pointed the pistol toward him at the time it was discharged. On this theory there is sufficient evidence to authorize an instruction upon voluntary manslaughter and to uphold the verdict, consequently the court did not err in refusing a peremptory instruction for defendant.

Wherefore, perceiving no error, the judgment is affirmed.